UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

GREGORY R. RADTKE,

        Plaintiff,

      v.                                             Case No. 04-C-510

AMERICAN FEDERATION OF STATE,
COUNTY AND MUNICIPAL EMPLOYEES--
MILWAUKEE DISTRICT COUNCIL 48, and
STAFF REPRESENTATIVES UNION,

        Defendants.

---

**DECISION AND ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

---

## I. BACKGROUND

      Gregory R. Radtke ("Radtke") commenced this action by filing a complaint naming American Federation of State, County and Municipal Employees-- Milwaukee District Council 48 ("Council 48") and Staff Representatives Union ("SRU") as defendants. Radtke brought this action pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and alleges that he was fired by Council 48 in violation of a collective bargaining agreement between Council 48 and SRU, and that SRU breached its duty of fair representation to Radtke. Radtke also alleges that Council 48 failed to pay him wages earned, in violation of Wisconsin law. Council 48 and SRU each filed a motion for summary judgment. Both motions are now fully briefed and ready for decision.

## II. FACTS

      Along with their briefs in support of their respective positions on the motions for summary judgment, each party filed proposed findings of fact ("PFOF") and supporting documentation for

such proposed findings. SRU adopted Council 48's proposed findings of fact as their own (SRU's PFOF at 1), and therefore, citation to Council 48's PFOF indicates agreement by SRU. A review of the parties' proposed findings of fact and their responses to such reveals that the parties are often not in agreement. The following facts, however, are undisputed unless otherwise noted.

Council 48 is a labor union operating in Milwaukee County and is affiliated with the American Federation of State, County and Municipal Employees (AFSCME) and the American Federation of Labor-Congress of Industrial Unions (AFL-CIO). In the calender year 2003 District 48 represented approximately 10,000 employees. (Council 48's PFOF ¶¶ 2-5; Pl.'s Resp. to Council 48's PFOF.)

Council 48 is comprised of smaller Local Unions, each of which elects delegates to Council 48. Council 48 has an Executive Board which is comprised of individuals chosen by the Locals as well as an Executive Director. The Executive Director reports to the Executive Board, is the chief operating and executive officer of Council 48, and is responsible for directing the staff of Council 48. During the year 2003, Richard Abelson ("Abelson") was the Executive Director of Council 48. (Council 48's PFOF ¶¶ 5-13; Pl.'s Resp. to Council 48's PFOF.)

In 2003, Council 48 employed approximately 13 employees. (Council 48's PFOF ¶ 14; Pl.'s Resp. to Council 48's PFOF.) A number of those employees, including Radtke, held the job title of "Staff Representative." (Council 48's PFOF ¶¶ 31-32; Pl.'s PFOF ¶ 3.) The staff representatives, as well as a couple other employees of Council 48, are represented for the purpose of collective bargaining by SRU. Radtke became a member of SRU upon the commencement of his employment at Council 48 in 1992. (Council 48's PFOF ¶¶ 17, 25, 31-32; Pl.'s Resp. to Council 48's PFOF.)

2

SRU is an independent union which in 2003 had a membership of nine individuals, all of whom were employed by Council 48. The names of SRU's officers in 2003 were Yunk (president), Purifoy (vice-president), and Mollenhauer (secretary-treasurer). (Council 48's PFOF ¶¶ 25-26, 30; Pl.'s Resp. to Council 48's PFOF.)

In calendar year 2003 Council 48 and SRU were bound by a collective bargaining agreement ("CBA" or " the agreement") having a term from October 1, 2001 through September 30, 2004. The agreement, at Article VII, provides in part, "No employee shall be disciplined, except for just cause." Article VIII of the agreement contains a grievance procedure with final and binding arbitration as the last step. (Council 48's PFOF ¶¶ 19-21; Pl.'s Resp. to Council 48's PFOF.)

Furthermore, Article IX of the agreement provides in part, "A staff member shall receive no payment for any part of accumulated sick leave and all vesting of rights shall be forfeited when . . . he/she has been terminated for just cause." The agreement also provides for specified amounts of paid vacation based on the length of an employee's tenure, but is silent as to the effect of termination for cause on an employee's vacation benefits. (Council 48's PFOF ¶¶ 22-24; Pl.'s Resp. to Council 48's PFOF.)

On April 4 and 9, 2003, Abelson sent Radtke memos regarding job related issues. On April 15, 2003, Abelson sent Radtke a further memo regarding a disciplinary meeting. The memo provided, "I am scheduling a disciplinary meeting for Monday, April 21, 2003 at 9:15 am in my office. You are entitled to have a union representative present at the meeting. If you have a conflict with another meeting at this time, change your other meeting." (Council 48's PFOF ¶¶ 33-35; Pl.'s Resp. to Council 48's PFOF.)

3

On April 21, 2003, Radtke was suspended from employment by a memo sent to him from

Abelson. The memo, after correction of some dates within, provides:

> Pursuant to our meeting this morning, I am imposing a five-day suspension, three days of which you will serve on April 22, 23 and 24, 2003. You have a previously approved vacation day on April 25, 2003. We will schedule the other two days of the suspension at a future date. As I indicated at the meeting, I am willing to consider not imposing the additional two days if and only if I see genuine and sincere contrition for your actions of April 9 and 10, 2003. The reasons for the suspension are your inappropriate conduct at the office the mornings of April 9 and 10, 2003. We thoroughly discussed your actions at our meeting this morning. Regarding your conduct, I expect you to conduct yourself in a professional, businesslike manner with all of your co-workers, as well as the officers and members of District Council 48. A sarcastic, unpleasant demeanor is not acceptable office behavior. Additionally, ignoring or giving any co-worker the "silent treatment" does not constitute appropriate office behavior, nor does the making [sic] derogatory comments about colleagues. The above list is not inclusive. I am merely pointing out in writing some general conduct that is acceptable and a couple of areas of conduct which by anyone's standards are not acceptable. Be advised that future inappropriate conduct will lead to further discipline up to and including discharge.

(Council 48's PFOF ¶ 38; Pl.'s Resp. to Council 48's PFOF.)

On April 16, 2003, Council 48 received two documents entitled "Certificate of Return to

Work" concerning Radtke. The first was signed by Mark S. Shapson, MD, and dated 4/9/2003. The

certificate provided, "This is to certify that Gregory R. Radtke has been under my care from 4/9/2003

for medical visit. Needs follow up visit within one month with Primary Medical Doctor." The

second certificate was signed by Robert E. Williams, MD, and dated 4/11/2003. It provided, "This

is to certify that Gregory R. Radtke has been under my care from 4/11/2003 and can return to regular

WORK [sic] on 4/16/03. RESTRICTIONS: None." (Council 48's PFOF ¶¶ 36-37; Pl.'s Resp. to

Council 48's PFOF.) On April 21, 2003, Abelson approved medical leave for Radtke for three

weeks. (Pl.'s PFOF ¶ 11; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

On April 28, 2003, Radtke sent Council 48 another certificate of return to work dated April 28 and signed by Dr. Andrew J. Catanzaro. The certificate provided, "This is to certify that Gregory R. Radtke has been under my care from 4/28/2003 and will be re-evaluated for a return to work in two weeks." (Council 48's PFOF ¶ 39; Pl.'s Resp. to Council 48's PFOF.) Abelson accepted this certification as satisfactory even though it did not contain Radtke's diagnosis. (Pl.'s PFOF ¶ 12; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

Thereafter, on May 20, 2003, Radtke called Council 48 to say that he would be out of work for two weeks, until June 3. That same day, Radtke also faxed to Council 48 a certificate of return to work again signed by Dr. Andrew J. Catanzaro and dated May 20, 2003. The certificate provided, "This is to certify that Gregory R. Radtke has been under my care from 4/28/2003 and will be re-evaluated for a return to work in two weeks. He is seen today." (Council 48's PFOF ¶¶ 41-42; Sweet Aff. at Ex. J; Pl.'s Resp. to Council 48's PFOF.)

On May 21, 2003, Abelson sent a letter to Radtke stating that the doctor's excuse faxed May 20 was unacceptable. The letter stated:

> Please have the physician who is supervising your care send me a medical statement which includes your diagnosis, the scope of duties which you are able to perform and your anticipated return date. Please have your physician send this notice immediately. I need to evaluate the appropriateness of your medical leave and this information is critical to that evaluation.

(Council 48's PFOF ¶ 43; Pl.'s Resp. to Council 48's PFOF.)

On May 27, 2003, Radtke left the following message with Council 48:

> Hey Lisa this is Greg ah I had I ah contacted my doctor today and ah he ah he's given me some information that says he cannot release um um the medical information according to the new HIPPA laws. Now I haven't got the slightest idea what that's all about but ah he says if he releases that information that he could be subject to ah ah violation of the state law, so ah I'm not I'm not sure what I am doing. All I know

is that I've got a doctor's appointment set for ah Tuesday, at 10:00. Ah till this point we were figuring I was probably coming back on Wednesday, so ah ah but I'm not sure that's up to him, when I go see him see how my test go so ah ah if you have any question ah please give me a call . . . .

(Pl.'s PFOF ¶ 21; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

Also on May 27, Abelson sent Radtke a letter stating:

I have been informed by my administrative assistant, Lisa Patterson, that you have indicated that you will not comply with my May 21, 2003 letter allegedly because HIPAA [sic] prohibits your physician from releasing the required information. I conclude that since HIPAA [sic] does not prohibit you from authorizing the release of the required information, you have prevented this information from being released by your physician. Therefore, your sick leave is being terminated effective today, May 27, 2003. You are now absent without leave. Each day constitutes a separate offense and subjects you to discipline up to and including discharge.

(Council 48's PFOF ¶ 45; Pl.'s PFOF ¶ 22.)

On May 29 or 30, 2003, SRU secretary/treasurer William Mollenhauer ("Mollenhauer") told Radtke that, per Abelson, Radtke was not to return to work, and if he did, he would be sent home. Radtke asked Mollenhauer to arrange a meeting with Abelson. (Pl.'s PFOF ¶ 27, 29; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

On June 4, 2003, Radtke met with Abelson and presented Abelson with a certificate of return to work dated June 3, 2003 which documented Radtke's "incapacitating unipolor depression." Abelson told Radtke it was too late and issued Radtke a memo dated June 4, 2003 documenting the termination of his employment. The memo provided in part:

I am terminating your employment with Milwaukee District Council 48, AFSCME, AFL-CIO, effective immediately. The reasons for your termination are insubordination, unapproved absence from work in excess of ten working days, and the discovery of an extensive pattern of unacceptable and poor job performance. The period from May 26, 2003 until today's discharge are considered as suspension time for your insubordination relating to your refusal to provide medical documentation

6

of your sick leave, and the serving of the final two suspension days from your discipline relating to your earlier inappropriate conduct.

(Council 48's PFOF ¶¶ 46-47; Pl.'s Resp. to Council 48's PFOF; Pl.'s PFOF ¶ 33; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

At the discharge meeting, Abelson kept telling Radtke that he was a lowlife, miserable person and that if Radtke was going further with this, Abelson would have all of his co-workers testify against him. Abelson then said that Radtke could avoid all of this by resigning and Council 48 would pay his vacation first followed by his sick leave until October 8, 2003. (Pl.'s PFOF ¶ 35; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)[1]

Mollenhauer was Radtke's SRU representative at the June 4, 2003 disciplinary meeting with Abelson. Mollenhauer had been trained to take notes at disciplinary meetings, but did not take any notes at the June 4 meeting. (Pl.'s PFOF ¶¶ 37-38; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

Mollenhauer is employed by Council 48 as a Staff Representative. While Mollenhauer was acting as Radtke's SRU representative, Abelson was Mollenhauer's boss and had the authority to fire Mollenhauer. (Pl.'s PFOF ¶¶ 50, 52-53; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

---

[1] At several places in their responses to Radtke's proposed findings of fact, the defendants respond with statements such as "Not disputed this is Radtke's testimony," or "Does not dispute that this is Radtke's testimony." *See e.g.* Council 48's Resp. to Pl.'s PFOF ¶¶ 35, 57, 61-63; SRU's Resp. to Pl.'s PFOF ¶¶ 35, 61-63. The court interprets such responses to mean that there is no material issue of fact regarding the facts asserted in the proposed findings of fact at issue. This is so because the defendants have not cited evidentiary materials in the record which support a claim that a dispute exists regarding those facts as required by Civil Local Rule 56.2(b)(1). *See also* Fed. R. Civ. P. 56(e).

7

On June 18, 2003, Mollenhauer filed separate grievances regarding Radtke's holiday pay (Memorial Day 2003), vacation pay, sick leave pay, suspension, and termination. Council 48 and SRU representatives exchanged a series of memos regarding the grievances. On August 21, 2003, SRU president Yunk informed Abelson that SRU requested that Radtke's six grievances proceed to arbitration. (Council 48's PFOF ¶¶ 49-54, 56; Pl.'s Resp. to Council 48's PFOF.)

Council 48 offered to settle all of Radtke's grievances for $20,000. Radtke learned of the proposed settlement from Mollenhauer in October of 2003, but did not agree with the settlement. On October 17, 2003, SRU considered the settlement offer and voted to accept it and not take Radtke's grievances to arbitration. (Council 48's PFOF ¶¶ 60-61, 63; Pl.'s Resp. to Council 48's PFOF; SRU's PFOF ¶ 19; Pl.'s Resp. to SRU's PFOF.)

Mollenhauer told Radtke that if he did not take the $20,000 offer, SRU was through with him because they had voted not to take his grievances to arbitration. Mollenhauer also said, "why would you think I would help you, you haven't talked to me in two years." Radtke replied, "What does that have to do with you representing me?" Mollenhauer laughed, and that was the end of the conversation. (Pl.'s PFOF ¶ 61; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

Radtke did not receive formal notice from SRU stating SRU's decision not to arbitrate his grievances even though written notice was the normal practice. Radtke asked Mollenhauer why he (Radtke) was not included in the meeting where it was decided not to arbitrate his grievances and Mollenhauer responded, "you're not a union member." In fact Radtke was a union member in October of 2003. (Pl.'s PFOF ¶¶ 62-64; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

8

At the same time he was negotiating a settlement for Radtke, Mollenhauer discussed a release for SRU with Abelson. (Pl.'s PFOF ¶ 65; Council 48's Resp. to Pl.'s PFOF; SRU's Resp. to Pl.'s PFOF.)

The parties are in substantial disagreement as to the merit of Radtke's grievances, how much money Radtke was owed by Council 48 under the collective bargaining agreement, and what position SRU took regarding the merits of Radtke's grievances during the grievance process. (Council 48's PFOF ¶¶ 55-68; Pl.'s Resp. to Council 48's PFOF.) The parties are also in substantial disagreement regarding the quality of Radtke's work performance prior to his discharge, the reasons for Radtke's firing, and the motivations behind actions taken by SRU in the course of its representation of Radtke. (SRU's PFOF ¶¶ 4-18; Pl.'s Resp. to SRU's PFOF.)

### III. SUMMARY JUDGMENT STANDARDS

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting Fed. R. Civ. P. 56(e) advisory committee's note to 1963 amendment). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

9

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

10

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## IV. DISCUSSION

### A. Radtke's § 301 "Hybrid" Claim

Radtke's first claim is a "hybrid" claim brought under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185. Section 185(a) provides for jurisdiction of the district courts in "[s]uits for violation of contracts between an employer and a labor organization . . . ." An individual employee, and not just the union, may bring suit against an employer for breach of a collective bargaining agreement. *DelCostello v. Int'l Bhd. of Teamsters*, 462 U.S. 151, 163 (1983). Ordinarily, an employee is required to attempt to exhaust any grievance or arbitration remedies provided in the collective bargaining agreement, and is bound by the result of such procedures according to the finality provisions of the agreement. *Id*. at 163-64. If, however, the union breaches its duty of fair representation to the employee, the employee is not bound and may bring suit against the union and the employer. *Id*. at 164.

In such a situation, the claim is called a "hybrid" claim because it consists of two distinct claims; a claim against the union for breach of its duty of fair representation, and a claim against the employer for breach of the collective bargaining agreement. *DelCostello,* 462 U.S. at 164-65. In order to prevail against either the union or the employer, the plaintiff must carry his burden on both prongs. *Id*. at 165. Therefore, in order for Radtke to prevail on his "hybrid" claim, he must establish:

11

(1) that SRU breached its duty of fair representation; and (2) that Council 48 breached the collective bargaining agreement.

**1. SRU's Duty of Fair Representation**

"[A] union breaches its duty of fair representation if its actions are either 'arbitrary, discriminatory, or in bad faith' . . . ." *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991) (quoting *Vaca v. Sipes*, 386 U.S. 171, 190 (1967)). Indeed, "the duty of fair representation parallels other fiduciary duties and '[j]ust as these fiduciaries owe their beneficiaries a duty of care as well as a duty of loyalty, a union owes employees a duty to represent them adequately as well as honestly and in good faith.'" *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992) (quoting *O'Neill*, 499 U.S. at 75). In assessing whether a union breached its duty of fair representation, a court should separately make each of the following inquiries: (1) did the union act arbitrarily; (2) did the union act discriminatorily; or (3) did the union act in bad faith. *Id.*

<u>Arbitrariness</u>

Radtke claims that SRU's decision to not take his grievances to arbitration was arbitrary. "[A] union's actions are arbitrary only if, in light of the factual and legal landscape at the time of the union's actions, the union's behavior is so far outside a 'wide range of reasonableness,' as to be irrational." *O'Neill,* 499 U.S. at 67 (quoting *Ford Motor Co. v. Huffman*, 345 U.S. 330, 338 (1953)). Although a union is not obliged to take all grievances to arbitration, it "'may not arbitrarily ignore a meritorious grievance or process it in a perfunctory fashion.'" *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003) (quoting *Vaca*, 386 U.S. at 191). "The union must provide some minimal investigation of employee grievances, but the thoroughness of this investigation depends

12

on the particular case, and only an egregious disregard for the union members' rights constitutes a breach of the union's duty." *Id.* (internal quotation marks and citations omitted).

SRU had filed several grievances on Radtke's behalf, challenging Radtke's suspension, his discharge, and the amount of money Radtke was owed upon his termination based on accumulated vacation and sick time. SRU initially voted to take Radtke's grievances to arbitration. The union thereafter changed course and voted to accept Council 48's offer to settle all of the grievances for $20,000 rather than go to arbitration.

Radtke argues that the decision to settle for $20,000 and not go to arbitration was arbitrary for several reasons. First, although Abelson's memo stated that Radtke was fired for insubordination, unapproved absences, and the discovery of an extensive pattern of unacceptable and poor job performance, SRU did not consider any eye-witness accounts of the basis for Radtke's discharge and did not review any documentation supporting Council 48's claim that Radtke was not performing his job adequately. (Pl.'s Br. at 7.) Radtke also claims that SRU officials who voted not to take his grievances to arbitration did not even know that Radtke had given Abelson documentation of his medical diagnosis before he was fired. (Pl.'s Br. at 8.) This is important, Radtke maintains, because that information undermines Council 48's position that he was insubordinate, and therefore Council 48's position that it had just cause to fire him. Radtke also argues that, although trained to do so, Mollenhauer did not take notes at Radtke's discharge meeting. (Pl.'s Br. at 9.) In sum, Radtke argues that SRU voted not to take his grievances to arbitration without information essential to determining the merit of the grievances.

Moreover, Radtke argues that, although Mollenhauer agreed that Radtke was entitled to 29 weeks of sick and vacation pay (an amount Radtke claims totals $43,000), SRU nevertheless voted

13

to accept a settlement offer of only $20,000 for all of the grievances, including the sick and vacation time payouts as well as the grievance challenging Radtke's discharge. Finally, Radtke argues that SRU refused to provide deposition testimony as to its reasons for deciding not to go to arbitration, thus further undermining any claim that the decision was a "well-reasoned strategy." (Pl.'s Br. at 9-11.)

The defendants deny that the decision not to proceed to arbitration was arbitrary and instead argue that accepting the $20,000 offer was a sound strategic decision based on the fact that Radtke's grievance relating to his discharge was without merit, and the question of how much he was owed under the CBA for accumulated sick and vacation time was questionable. (Council 48's Br. at 7-8; SRU's Br. at 6.)

As a preliminary matter, the defendants dispute that the evidence Radtke cites supports many of his factual conclusions. For example, SRU disputes Radtke's claim that SRU officials did not have any information about Radtke's alleged poor work performance when they voted not to proceed to arbitration. (SRU's Reply at 3.) The defendants also respond to Radtke's proposed findings of fact in several instances with statements such as "Disputed, not supported by the record cited. An alternative finding that reflects the citation would be . . . ," filling in an alternate reading of the evidence cited. *See e.g.,* Council 48's Resp. to Pl.'s PFOF ¶¶ 40-42; SRU's Resp. to Pl.'s PFOF ¶¶ 40-42. However, at this point in the proceedings the court must construe all facts in the light most favorable to Radtke and must draw all reasonable inferences in his favor. Although the deposition testimony that Radtke cites may sometimes be amenable to alternate interpretations, as long as Radtke's interpretations are reasonable, the court must accept them at this stage of the proceedings.

14

Construing all facts in the light most favorable to Radtke and drawing all reasonable inferences from them, Radtke has provided evidence to the effect that SRU did not consider any documentation of his purportedly inadequate job performance, even though that was one of the stated reasons for his being fired. Radtke also offers evidence to the effect that, although one SRU official (Mollenhauer) was at the meeting where Radtke provided his diagnosis to Abelson (the information which Radtke's "refusal" to provide formed the basis of his being fired), the other voting members of SRU were not informed of this fact and voted not to proceed to arbitration without that knowledge.

These two pieces of information seem to be essential to determining the merits of Radtke's grievance challenging his discharge, and therefore also to deciding whether or not to proceed to arbitration. A rational fact finder could determine that SRU's failure to seek any documentation of poor work performance constitutes a failure to conduct the "minimal investigation" required by the facts of that particular grievance. A rational fact finder could also determine that Mollenhauer's failure to communicate the information that Radtke attempted to give Abelson his medical diagnosis deprived the voting members of SRU of information essential to determining whether or not Radtke was insubordinate. That piece of information is especially important when viewed along with the phone message Radtke left with Council 48 claiming that Radtke's doctor (and not Radtke) was refusing to release his diagnosis.

Furthermore, although the defendants argue that SRU's decision not to proceed to arbitration was a rational strategy decision, SRU has refused to disclose its rationale. Citing attorney/client privilege, SRU's lawyer did not allow SRU President Patricia Yunk to testify at her deposition about any of SRU's rationale for deciding not to take Radtke's grievances to arbitration. (Yunk Aff. at 47.)

15

In light of the Radtke's arguments, SRU's refusal to explain its motivations could lead a rational fact finder to place more weight on Radtke's explanations, i.e., that the decision was arbitrary.

Based on the foregoing, I conclude that there are issues of material fact regarding whether or not SRU's representation of Radtke was arbitrary. Simply stated, the evidence is such that a reasonable fact finder could find that SRU voted on Radtke's grievances without the basic information necessary to evaluating the merit of the grievances. A reasonable fact finder could also find that SRU members who voted lacked that information because SRU failed to do a minimally sufficient investigation and because an SRU official (Mollenhauer) failed to communicate and disseminate information amongst the other voting members. If that is the case, then it is also a reasonable conclusion that SRU's representation of Radtke was so far outside the "wide range of reasonableness" that it was arbitrary, and SRU therefore breached its duty of fair representation.

Bad Faith

Radtke also maintains that SRU breached its duty of fair representation because it acted in bad faith. "Whether or not a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal v. Newspaper Holdings, Inc.*, 349 F.3d 363, 369 (7th Cir. 2003). For example, comparing the role of the union to that of a fiduciary, the *Ooley* court held that were union representatives to put their personal interests ahead of the plaintiffs' interests, such self-protectionist motives could be the basis for a bad faith claim. *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1303 (7th Cir. 1992).

In this regard, Radtke has presented evidence which he argues shows that SRU acted with improper motives. First, Radtke claims that Mollenhauer bore a personal animus against him which

16

was a motivating factor in SRU's representation of Radtke. Radtke contends that Mollenhauer's failure to take notes at Radtke's discharge meeting, and his failure to disseminate the fact that Radtke had provided his diagnosis to Abelson, was motivated by personal animus. (Pl.'s Br. at 12.) Radtke has provided uncontroverted testimony that in a conversation with Radtke about SRU's decision not to go to arbitration, Mollehnauer said, "why would you think I would help you, you haven't talked to me in two years." Radtke reportedly replied, "what does that have to do with you representing me?" Mollenhauer then laughed in response. (Pl.'s PFOF ¶ 61.)

Radtke next asserts that SRU's actions in representing him were motivated by SRU's self-interest. Radtke claims that SRU Vice President Gerty Purifoy missed the deadline in which to appeal the denial of one of Radtke's grievances (apparently the grievance challenging Radtke's suspension), and SRU's vote not to go to arbitration was motivated by its desire to cover that error. (Pl.'s Br. at 12.) Radtke also claims that Mollenhauer negotiated a "release" for himself, Yunk, and Purifoy at the same time that he was negotiating with Abelson as Radtke's union representative. (Pl.'s Br. at 16.)

The defendants respond to Radtke's bad faith claims largely by denying that there were any improper motives. For example, SRU argues that the release which Mollenhauer obtained for SRU was a "matter of course," and that Purifoy believed that she had not missed an appeals deadline because she believed that "time lines are tolled if there are ongoing discussions about the subject matter of the grievance . . . ." (SRU's Reply at 7-8.)

In the court's view, these disputes are issues of material fact. Radtke has presented evidence in support of his allegation that SRU acted with improper motives in its representation of him. Construing that evidence in the light most favorable to Radtke, and drawing all reasonable inferences

17

in his favor, the court finds that a reasonable fact finder could conclude that SRU acted with improper motives constituting bad faith, and therefore breached its duty of fair representation to Radtke.

### 2. Breach of the Collective Bargaining Agreement

In order to prevail on his § 301 hybrid claim, Radtke must also establish that Council 48 breached the CBA. "The substantive law in a section 301 suit for breach of the collective bargaining agreement is federal common law rather than state law." *Crider v. Spectrulite Consortium, Inc.*, 130 F.3d 1238, 1242 (7th Cir. 1997).

Radtke argues that Council 48 breached the CBA because it fired him without the "just cause" required by the agreement. The reasons Council 48 gave for firing Radtke were insubordination, unapproved absence from work in excess of ten working days, and the discovery of an extensive pattern of unacceptable and poor job performance. However, Radtke argues, and has provided evidence to support the claim, that he would not have been fired if he had provided his medical diagnosis to Abelson. (Pl.'s PFOF ¶ 25.)[2] Indeed, Radtke's absences from work were "unapproved" because he did not provide his medical diagnosis to Abelson, the same conduct which allegedly constituted insubordination. Furthermore, Radtke has provided evidence to the effect that there was no documentation of poor work performance on his part, and argues that he in fact had a positive work history at Council 48. Based on this, a reasonable fact finder could conclude that, despite Council 48's stated reasons, Radtke was fired solely because he did not provide his medical diagnosis to Abelson.

---

[2] This is one of Radtke's proposed findings of fact to which the defendants argue for an alternative interpretation of the evidence cited by Radtke. *See* Council 48's Resp. to Pl.'s PFOF ¶ 25; SRU's Resp. to Pl.'s PFOF ¶ 25. As stated above, for the purpose of this motion the court accepts Radtke's reasonable interpretation of the evidence.

Case 2:04-cv-00510-WEC    Filed 06/23/05    Page 18 of 25    Document 53

The question then becomes, was Radtke's failure to provide his diagnosis "just cause" for firing him? This question is crucial to assessing Radtke's grievance challenging his being fired, but it is also crucial to his grievances regarding payment for unused benefit time. This is so because under the CBA, the amount due to an employee for unused benefit time depends on whether or not there was just cause for the discipline involved. (Council 48's Br. at 12.)

While the CBA does not define "just cause," the Seventh Circuit has held that "[j]ust cause is a flexible concept, embodying notions of equity and fairness, [a]nd for a penalty to be just it must be in keeping with the seriousness of the offense." *Crider*, 130 F.3d at 1242 (quotation marks and citations omitted). When the facts are undisputed, the question of whether or not there was just cause is a question of law for the court. *Id.* In the case at hand, however, whether or not there was just cause to fire Radtke turns on whether or not he was insubordinate (that is, if the fact finder concludes that Radtke was fired because he did not provide his diagnosis to Abelson, and not because of poor job performance). Surely, insubordination is just cause for firing an employee. If, however, Radtke was attempting to comply with Abelson's directives, but was prevented from doing so by no fault of his own, or because of a misunderstanding, then it may well be that termination would not be equitable or "in keeping with the seriousness of the offense."

Radtke maintains that he at no time indicated that he would not comply with Abelson's request for information. (Pl.'s Br. at 17-18.) Instead, Radtke paints a scenario where he was making good faith efforts to comply. Radtke claims that upon being asked for his diagnosis, he faxed Abelson's request to his doctor, and the doctor recommended that "because of the new HIPAA laws" Abelson should not be given the diagnosis. (Pl.'s Br. at 17.) Radtke left a message to that effect with Abelson's assistant, and Abelson responded in writing that "I conclude that since HIPAA does not

19

prohibit you from authorizing the release of the required information, you have prevented this information from being released by your physician." (Pl.'s Br. at 18.) Radtke maintains that the next day after Abelson's communication on which he could get in to see his doctor was June 3, 2003, and that he obtained a written diagnosis on that day and provided it to Abelson the next day. (Pl.'s Br. at 18-19.) In short, Radtke maintains that he was not insubordinate, but instead attempted to, and did in fact, comply with Abelson's directive.

In the court's view, the parties' varying characterizations of the scenario described above demonstrate that there are disputed material issues of fact. To summarize, the evidence is such that a reasonable finder of fact could conclude that, despite Council 48's stated reasons, Radtke was not fired because of poor job performance or unexcused absences, but because he did not provide his medical diagnosis to Abelson upon request. A reasonable fact finder could also conclude that Radtke was not insubordinate, but instead made a good faith effort to comply with Abelson's directive, and that he was slow in complying because of his doctor's misunderstanding of the law. In that case, notions of equity and fairness could counsel that there was not "just cause" for firing Radtke. In other words, it might not be "in keeping with the seriousness of the offense" to fire an employee in such circumstances. And if there was no just cause to fire Radtke, then Council 48 breached the CBA when it did so.

Based on the foregoing, I cannot say that no reasonable fact finder could return a verdict in Radtke's favor on his claim that Council 48 breached the CBA. Because I have found that there are issues of material fact on both prongs of Radtke's § 301 hybrid claim, the defendants motions for summary judgment on that claim will be denied.

20

**B. Radtke's State Law Claim**

Radtke's second claim is that Council 48 failed to compensate him for wages earned, in violation of Wisconsin Statutes Chapter 109. Wisconsin Statutes § 109.03(1) provides that "[e]very employer shall as often as monthly pay to every employee engaged in the employer's business . . . all wages earned by the employee to a day not more than 31 days prior to the date of payment." Moreover, § 109.03(2) provides, "Any employee . . . who quits employment or who is discharged from employment shall be paid in full by no later than the date on which the employee regularly would have been paid under the employer's established payroll schedule or the date of payment required under sub. (1), whichever is earlier." Finally, § 109.01(3) defines "wages" to mean:

> remuneration payable to an employee for personal services, including salaries, commissions, holiday and vacation pay, overtime pay, severance pay or dismissal pay, supplemental unemployment benefit plan payments when required under a binding collective bargaining agreement, bonuses and any other similar advantages agreed upon between the employer and the employee or provided by the employer to the employees as an established policy.

Council 48 argues that Radtke's unpaid wages claim is preempted by federal law. "The Supreme Court has construed the preemptive force of § 301 to be 'so powerful as to displace entirely any state cause of action for violation of contracts between an employer and a labor organization.'" *Baker v. Kingsley*, 387 F.3d 649, 657 (7th Cir. 2004) (quoting *Franchise Tax Bd. of Cal. v. Constr. Laborers Vacation Trust for S. Cal.*, 463 U.S. 1, 23 (1983)). "Any such suit is purely a creature of federal law, notwithstanding the fact that state law would provide a cause of action in the absence of § 301." *Franchise Tax Bd.*, 463 U.S. at 23.

"The Supreme Court has cautioned, however, that 'not every dispute concerning employment, or tangentially involving a provision of a collective-bargaining agreement, is pre-empted by § 301

21

or other provisions of the federal labor law.'" *Baker*, 387 F.3d at 657 (quoting *Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985)).

> To determine whether a state-law claim is preempted, we must look at the "legal character" of the claim: a "question of state law, entirely independent of any understanding embodied in the collective bargaining agreement," may go forward as a state-law claim, *Livadas v. Bradshaw*, 512 U.S. 107, 124-25, 114 S.Ct. 2068, 129 L.Ed.2d 93 (1994); whereas a claim, the resolution of which "is sufficiently dependent on an interpretation of the CBA," will be preempted. *Bentz Metal*, 253 F.3d at 286. If a state-law claim requires reference to, but not interpretation of, a collective bargaining agreement, the claim is not preempted. *Id*. at 285.

*Id*.

In *Livadas v. Bradshaw*, 512 U.S. 107, 125 (1994), the Supreme Court held that "the mere need to 'look to' the collective-bargaining agreement for damages computation is no reason to hold the state-law claim defeated by § 301." In *Livadas*, the Court found that "[b]eyond the simple need to refer to bargained-for wage rates in computing the penalty, the collective-bargaining agreement is irrelevant to the dispute," and the state law claim was therefore not preempted. *Id*. Furthermore, if a "particular contractual provision is so clear as to preclude all possible dispute over its meaning," this too might negate the need for the court to interpret the contract, and thus § 301 would not be preemptive. *Baker*, 387 F.3d at 658 (quoting *Metalcrafters v. McNeil*, 784 F.2d 817, 824 (7th Cir.1986)).

In the case at hand, it is not clear exactly what "wages" Radtke claims he was not paid. It appears that Radtke is claiming he is owed wages consisting of pay for the time period between May 27 and June 4, 2003 (the period when Radtke claims he should have been on sick leave but Abelson determined that he was "absent without leave") as well as payouts for all of his unused sick and vacation time. (Pl.'s Br. at 22.) As discussed above, whether or not Radtke's claim for unpaid wages

22

is preempted by § 301 will depend on whether or not resolving the claim requires this court to interpret the CBA.

As to the time period between May 27 and June 4, 2003, whether or not Radtke should be considered to have been on sick leave or absent without leave will depend on provisions of the CBA regarding what sick time employees are entitled to and what they must do to access those benefits. Radtke argues that the CBA does not require employees to present their medical diagnosis before taking sick time, while Council 48 argues that Abelson had the authority to require the diagnosis and nothing in the CBA prohibits him from doing so. (Pl.'s Br. at 17, 19-20; Council 48's Reply at 8-9.) Based on these arguments, it appears that determining whether or not Radtke should have been allowed to use sick time between May 27 and June 4, 2003 will require the court to interpret the CBA.

As to the unused benefit time, Radtke does not claim that Wisconsin law requires employers to provide paid benefit time. Instead, Radtke argues that he is entitled to payment based on the CBA. Therefore, unless determining Radtke's entitlement to payment under the CBA would only require the court to "look at" the CBA, or is "so clear as to preclude all possible dispute over its meaning," Radtke's state law claim will be precluded by § 301.

Determining whether or not Radtke is entitled to payment for his unused benefit time is not as simple as looking at the CBA. Article IX of the agreement provides that an employee shall not receive payment for accumulated sick time if that employee is fired for just cause. (Supplemental Sweet Aff. Ex. A.) So whether or not Radtke is entitled to payment will require the court to interpret

23

what constitutes just cause under the CBA.[3]  The CBA says nothing about payment for vacation time, and therefore, if the court were to determine that Radtke is nevertheless entitled to payment for vacation time, that would necessarily involve some further interpretation of the CBA.

Based on all of the above, the court finds that Radtke's state law claim for unpaid wages is preempted by § 301.  Simply stated, resolution of the Radtke's unpaid wages claim would require the court to interpret the CBA.  Council 48's motion for summary judgment on such claim will therefore be granted.

## V.  CONCLUSION AND ORDERS

In conclusion, and for all of the foregoing reasons, the court finds that there are genuine issues of material fact regarding Radtke's § 301 hybrid claim, and the defendants' motions for summary judgment on that claim will therefore be denied.  The court also finds that Radtke's state law unpaid wages claim is preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, and Council 48's motion for summary judgment on that claim will therefore be granted.

**NOW THEREFORE IT IS ORDERED** that Council 48's motion for summary judgment be and hereby is **GRANTED IN PART** and **DENIED IN PART**;

**IT IS FURTHER ORDERED** that defendant SRU's motion for summary judgment be and hereby is **DENIED**;

The court will conduct a scheduling conference in this matter on Wednesday, July 6, 2005, at 9:00 a.m. in Room 253 of the U.S. Courthouse, 517 E. Wisconsin Avenue, Milwaukee, WI 53202.

---

[3] As noted above, the CBA does not contain a definition of "just cause."  Nevertheless, in determining what constitutes just cause, the court is to look to other portions of the CBA for guidance. *See Crider*, 130 F.3d at 1242.

At that time the court will discuss with the parties the steps necessary to bring this action to

conclusion.

        **SO ORDERED** this <u>23rd</u> day of June, 2005, at Milwaukee, Wisconsin.




<u>/s/ William E. Callahan, Jr.</u>
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge